**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: idiaz@bursor.com

*Attorneys For Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA EVERSON, individually and on behalf of all other persons similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>PACIFIC MARKET INTERNATIONAL, LLC d/b/a STANLEY<br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amanda Everson ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant, Pacific Market International, LLC d/b/a Stanley ("Defendant" or "Stanley").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Stanley for aiding, agreeing with, employing, procuring, or otherwise enabling the wiretapping of the electronic communications of visitors to its website, https://www.stanley1913.com (the "Website").

2.      Specifically, Defendant aids, agrees with, procures, or otherwise enables Meta Platforms, Inc. ("Meta"), a third-party service provider, to collect information from visitors to its Website.

3.      In particular, Defendant enables Meta, to eavesdrop on Website visitors' communications as they conduct searches and browse for products on the Website without visitors' prior consent.  Defendant has enabled Meta's interception of visitor's communications by employing Meta's services to track users across the Website using Meta's pixel tracker—the Meta Pixel.

4.      The electronic communications made in response to Website visitor's searches conducted on the Website are contemporaneously captured or otherwise acquired by Meta to, among other things, assist Defendant with its marketing, advertising, and data analytics efforts.

5.      The nature of the Meta's licensing agreement with Defendant is such that Defendant "aids, agrees with, employs, or conspires" to permit Meta to read, attempt to read, to learn, and/or to use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632.

6.      Plaintiff brings this action on behalf of all California residents who conducted searches for products on the Website while in California, and whose electronic communications were intercepted or recorded by Meta.

1

## THE PARTIES

2

**I.      PLAINTIFF**

3       7.      Plaintiff Amanda Everson is an adult citizen of the state of California and resides in

4   Martinez, California.

5       8.      Plaintiff Everson created a Facebook account around 2008.  Between November and

6   December of 2023, Plaintiff Everson accessed Defendant's Website to search for some of

7   Defendant's products on the same browser she uses to access her Facebook account.  Specifically,

8   Plaintiff Everson used the search bar on Defendant's Website to search for the IceFlow and

9   Quencher products, by typing these product names into the search bar.  Each of these

10  communications were intercepted in transit by Meta—as enabled by Defendant.  Neither Defendant

11  nor Meta procured Plaintiff Everson's prior consent to this interception.  Plaintiff Everson did not

12  discover and could not have discovered this violation until approximately February 2024 upon

13  discussion with her retained counsel.

14  **II.     DEFENDANT**

15      9.      Defendant Pacific Market International, LLC d/b/a Stanley, is incorporated in the

16  State of Washington and has its principal place of business in Seattle, Washington.  Defendant is a

17  corporation most known for its sale of drinkware products.

18  ## JURISDICTION AND VENUE

19      10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

20  because this case is a class action where the aggregate claims of all members of the proposed class

21  are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the

22  proposed class is a citizen of a state different from at least one Defendant.

23      11.     The Court has specific personal jurisdiction over Defendant because Plaintiff's

24  claims relate to and arise from Stanley's contacts with California and Stanley's contacts with

25  California represent a purposeful availment of the privilege of conducting activities in California.

26      12.     Specifically, Stanley's contacts with California involve Stanley collecting user

27  activity data for California residents that utilize Stanley's Website and using that data to "tailor

28

advertisements and content to increase user engagement" in California.  *See Rancourt v. Meredith Corp.*, No. 22-CV-10696-ADB, 2024WL 381344, at *9 (D. Mass. Feb. 1, 2024).  As described in detail below, Stanley can use California Website users' data to increase user engagement in California through its use of Meta's advertising tools, such as building Custom Audiences.  As such, Stanely is not only aware that it obtains data from California Website users, but is also "taking a 'voluntary act[]' to foster the '"regular flow or regular course of sales"' from California.  *See id.* (citing *Knox v. MetalForming Inc.*, 914 F.3d 685, 692 (1st Cir. 2019)).  By engaging in its practice of collecting and sharing California consumers' data with Meta to target California consumers with advertising, Stanley also ultimately derives revenue from California consumers.

13.     Plaintiff's claims are related to and arise out of Stanley's contacts with California because by using California Website users' data to target California consumers with advertising, Stanley obtains more Website traffic from California, allowing Stanley to further collect and disclose its California Website users' communications—*i.e.* enabling Meta's interception of users' communications with Stanley.  *See id.* at *10.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.      OVERVIEW OF THE META PIXEL

15.     Defendant enables Meta to intercept Plaintiff and Class Members' communications by employing the Meta Pixel on the Website in the manner described throughout this Complaint.

16.     Facebook describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2]  To that end, when

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

creating an account, users must provide their first and last name, along with their birthday and gender.[3]

17.     Meta owns facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[4]  In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

18.     Meta sells advertising space by highlighting its ability to target users.[7]  Meta can target users so effectively because it surveils user activity both on and off its site.[8]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

19.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike

---

[3] FACEBOOK, SIGN UP, https://www.facebook.com/

[4] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[6] *Id.*

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]

20.    Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[14]

21.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]

22.    Put succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

23.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can

---

[13] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[16] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

choose, including what content a visitor views or purchases.[17]  Advertisers can even create their

own tracking parameters by building a "custom event."[18]

24.     One such Business Tool is the Meta Tracking Pixel.  Meta offers this piece of code

to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Meta

Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website

hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to

simultaneously send a separate message to Meta's servers.  This second, secret transmission

contains the original GET request sent to the host website, along with additional data the Pixel is

configured to collect.  This transmission is initiated by Meta code and concurrent with the

communications with the host website.  Two sets of code are thus automatically run as part of the

browser's attempt to load and a website: the website's own code, and Meta's embedded code.

25.     An example illustrates the point.  Take an individual who navigates to Stanely's

Website and searches for the Quencher product.  Once the individual conducts the search, the

individual's browser sends a GET request to Defendant's server requesting that server to load the

particular webpage.  Because Defendant utilizes the Meta Tracking Pixel, Meta's embedded code,

written in JavaScript, sends secret instructions back to the individual's browser, without alerting

the individual that this is happening.  Meta causes the browser to secretly and simultaneously

duplicate the communication with Defendant, transmitting it to Meta's servers alongside additional

information that transcribes the communication's content and the individual's identity.  This entire

process occurs within milliseconds.

26.     In other words, when a user communicates with Defendant's website, those

communications are simultaneously and contemporaneously duplicated and sent to Meta at the

same time as they are being sent to Defendant.  Thus, Meta's interception of these communications

---

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://
www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/
business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

occurs "in transit." *See*, *e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

27.     After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

28.     Meta's other Business Tools function the same.  For mobile applications, advertisers can utilize the Meta SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[20]

29.     Advertisers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[21]  More technically, the Conversions API is Meta code that advertisers can implement server-side.[22]

30.     Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Meta's Conversion API endpoint." [23]

31.     When the Conversions API collects "[s]erver events," those data points are "linked

---

[20] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.

[22] *Id.*

[23] *Id.*

---

to a Meta Pixel ID and are processed like web events sent via Pixel."[24]  As with the Meta Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously. [25]  Meta "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[26]

32.     Meta confirms, in its "Meta Business Tools Terms,"[27] that it has the capability to the use information it collects for purposes other than recording it and conveying it to Defendant. For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."  In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.

33.     Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products"[28]

34.     Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[29]

---

[24] *Id.*

[25] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[26] *Id.*

[27] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[28] *Id.*

[29] *Id.*

35.    Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[30]

36.    Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to its customers, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

## II.    DEFENDANT EMPLOYS THE META TRACKING PIXEL TO TRACK USERS ON ITS WEBSITE, ENABLING META TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT.

37.    Defendant has integrated the Meta Pixel, into its Website**.**  By integrating the Pixel into its Website code, Defendant has enabled Meta to intercept Defendant's Website users' communications with Defendant as users search and browse for products on the Website without users' consent.

38.    Through the Meta Pixel, Defendant enables Meta to intercept users' communications with Defendant.  When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed the Meta Pixel on its Website, the Meta Pixel generates two events, a PageView and Search event that share metadata to Meta.  The metadata for these events include the exact search terms users input in Defendant's Website's search bar.

39.    For example, when a user searches for "purple water bottle" on the Stanely Website, the Meta Pixel generates a PageView event that includes metadata that tells Meta the user searched for "purple water bottle."  *See* Figures 1-2.

---

[30] *Id*.

1

2

3

4

5

6

7

8

9

10

11

12



**Figure 1**

13

14

15

16

17

18

19

20

21

22

23

24

25



**Figure 2**

26

27

28

40.      The Search event similarly shares metadata with Meta that tells Meta that the user searched for "purple water bottle."  *See* Figures 3-4.



**Figure 3**



**Figure 4**

41.     Users' search terms on Defendant's Websites are communications that are a product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).

42.     Further, beyond intercepting Website users' communications to Defendant via the Website, Defendant enables Meta to pair the event data with a user's identity.  Specifically, the Meta Pixel—as enabled by Defendant—pairs event data with a user's Facebook ID.

43.     When a user accesses Defendant's Website while logged into Facebook, the Meta Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID.  Figures 5 through 7 show a copy of the c_user cookie being transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking on the F12 button on a keyboard.



**Figure 5**



**Figure 6**

**Figure 7**

44.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody* – not just Meta – to identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in Figures 5-7 above is 100000984007553, and www.facebook.com/100000984007553 leads to this individual's Facebook page.

45.     When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a smaller set of cookies.[31]  No matter the circumstances, Meta receives at least one cookie from a Website user's browser—the fr cookie.

46.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[32]  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[33]  The datr cookies also identifies a browser.  Meta, at a minimum, uses the fr and _fbp cookies to identify users.[34]

47.     The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[35]  If that happens, the timer resets and another ninety days begins to accrue.[36]

48.     The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[37]  If that happens, the time resets, and another ninety days begins to accrue.[38]

---

[31] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[32] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[33] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[34] *Id*.

[35] *Id*.

[36] Confirmable through developer tools.

[37] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[38] Also confirmable through developer tools.

---

49.     The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Website.[39]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Meta.[40]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

50.     Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

51.     Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

**III.     DEFENDANT NEVER RECEIVED USERS' CONSENT TO EMPLOY THE META TRACKIGN PIXEL TO INTERCEPT USERS' COMMUNICATIONS**

52.     Defendant discloses its Website users' confidential communications to Meta without obtaining users' consent.

53.     When a Website user first accesses the Website, they are faced with a cookie usage banner at the bottom of the webpage that purports to give users the ability to choose whether to accept the use of cookies on the Website, or to opt out of the use of cookies by pressing on the "Do not sell or share my personal information" button.  *See* Figure 8.

---

[39] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[40] *Id*.  This is also confirmable by tracking network activity.

1
2
3
4
5
6
7
8
9
10



**Figure 8**

11
12

54.     As an initial matter, users are neither on notice of, nor do they consent to

13    Defendant's "cookie banner."  The banner is located at the bottom of the screen, and users are in no

14    way required to engage with the cookie banner in order to use the Website.  Effectively, the

15    "cookie banner" is non-binding browsewrap.  *Price v. Carnival Corp.*, 2024 WL 221437, at *4-5

16    (S.D. Cal. Jan. 19, 2024) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)).

17    55.     Further, any "consent" ostensibly given by users is an illusion.  Even when a user

18    clicks "do not sell or share my personal information," Defendant continues to share users' personal

19    browsing data and identifiers with Meta.  Thus, Defendant never properly obtains consent from its

20    users to disclose their communications, and any consent allegedly obtained is meaningless and

21    void.

22                            **CLASS ACTION ALLEGATIONS**

23    56.     Plaintiff Amanda Everson seeks to represent a class of all California residents who

24    entered information into Defendant's Website by conducting searches using the Website's search

25    bar while in California (the "Class").

26    57.     Plaintiff reserves the right to modify the class definition or add sub-classes as

27    necessary prior to filing a motion for class certification.

28

58.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

59.    Excluded from the Class are Stanley; any affiliate, parent, or subsidiary of Stanley; any entity in which Stanley has a controlling interest; any officer director, or employee of Stanley; any successor or assign of Stanley; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

60.    **Numerosity.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  Class Members can be readily identified from Stanley's records and non-party records, such as those of Meta.

61.    **Typicality.**  Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other members, visited Stanley's website and had her confidential electronic communications intercepted and disclosed to Meta.

62.    **Adequacy.**  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

63.    **Common Questions of Law and Fact Predominate.**  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include, but are not limited to, the following: whether Defendant

violated CIPA § 631 and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

64.     **Superiority.**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631

65.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

66.     Plaintiff brings this claim against Defendant individually and on behalf of the Class.

67.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any

wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

68.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

69.     The Meta Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

70.     Meta is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device."  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Meta had the capability to use the wiretapped information for its own purposes.  Accordingly, Meta was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

71.     At all relevant times, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

72.     At all relevant times, Meta used or attempted to use the communications intercepted by its Pixel to promote and improve its advertising platform.

73.     At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Meta to wiretap Plaintiff and Class Members using the Meta Pixel and to accomplish the wrongful conduct at issue here.

74.     Plaintiff and Class Members did not provide their prior consent to Meta's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Meta's conduct.

75.     The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Stanely Website and where Meta—as enabled by Defendants—routed Plaintiff and Class Members' electronic communications to their servers.

76.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the putative Class, naming Plaintiff as the representative of the putative Class, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

(b)     For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

(d)     For statutory damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)   For injunctive relief as pleaded or as the Court may deem proper; and

(g)   For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: March 28, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Sarah N. Westcot*

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: idiaz@bursor.com

*Attorneys for Plaintiff*